**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | |
|---|---|
| STATE OF TEXAS;<br>TEXAS DEPARTMENT OF<br>FAMILY AND PROTECTIVE<br>SERVICES; ARCHDIOCESE OF<br>GALVESTON-HOUSTON,<br><br>*Plaintiffs*,<br><br>v.<br><br>ALEX AZAR, Secretary of the United<br>States Department of Health and Human<br>Services; UNITED STATES<br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES; the UNITED<br>STATES OF AMERICA,<br><br>*Defendants*. | Civil Action No. 3:19-cv-00365 |

**PLAINTIFFS' JOINT MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................v

INTRODUCTION ................................................................................1

STATEMENT OF THE NATURE AND STAGE OF THE
PROCEEDINGS ..................................................................................3

STATEMENT OF THE ISSUES .............................................................3

STATEMENT OF UNDISPUTED MATERIAL FACTS.............................4

   A.  The Texas foster care system ........................................................4

   B.  The Archdiocese would like to support the provision of foster
       care services to children in need ...................................................6

   C.  Section 75.300 was flawed from the start......................................8

   D.  HHS grants South Carolina a waiver of Section 75.300's
       religious non-discrimination provision ..........................................9

   E.  A federal court in Michigan enjoins Section 75.300......................11

   F.  HHS concedes that Section 75.300 likely violates RFRA and
       cannot survive strict scrutiny....................................................12

   G.  Section 75.300 prevents the Archdiocese from providing foster
       care services in partnership with Texas. ......................................13

SUMMARY OF THE ARGUMENT.......................................................14

ARGUMENT ......................................................................................15

I. Section 75.300 violates the Free Exercise Clause (Count VII) .................15

   A.  Section 75.300 is not generally applicable .....................................16

      1.  HHS has permitted individualized exemptions to Section
          75.300..............................................................................16

      2.  HHS has permitted categorical exemptions to Section
          75.300..............................................................................17

   B.  Section 75.300 is not neutral........................................................19

   C.  Section 75.300 cannot survive strict scrutiny.................................20

      1.  HHS has no compelling governmental interest in applying
          Section 75.300 to the Archdiocese or other religious bodies
          that help foster children ....................................................21

      2.  Section 75.300 does not further HHS's interests or help
          more children find foster families .......................................22

    3.  Applying Section 75.300 to the Archdiocese or other religious bodies is not the least restrictive means of advancing HHS's purported interests.................................23

II. Section 75.300 violates the Religious Freedom Restoration Act (Count VI)........................................................................24

   A. Section 75.300 imposes a substantial burden on the Archdiocese's religious exercise....................................25

   B. Section 75.300 neither advances a compelling interest nor pursues one through the least restrictive means....................29

III. Section 75.300 violates the Administrative Procedure Act........29

   A. The Housekeeping Statute does not authorize Section 75.300 (Count III)........................................................30

     1.  The Housekeeping Statute does not authorize substantive rules like Section 75.300.......................................31

     2.  The Housekeeping Statute does not authorize HHS to address major questions............................................33

   B. Section 75.300 Violates Title IV-E (Count II)...................34

     1.  The Secretary cannot impose additional funding requirements ........................................................................35

     2.  The Secretary cannot alter the non-discrimination requirements Congress chose...................................37

   C. Section 75.300 is arbitrary and capricious (Counts IV-V)...............40

     1.  HHS's reasoning was internally inconsistent (Count IV)...............41

     2.  HHS failed to account for important interests (Count V)...............42

   IV. Injunctive relief is appropriate..........................................45

CONCLUSION.................................................................46

CERTIFICATE OF CONFERENCE...............................................49

CERTIFICATE OF SERVICE......................................................50

ADDENDUM

   Attachment A ...............................................................Add. 1

   Attachment B ...............................................................Add. 5

   Attachment C ...............................................................Add. 13

     Exhibit A....................................................................Add. 17

     Exhibit B....................................................................Add. 24

Exhibit C ........................................................................................Add. 27

Exhibit D ........................................................................................Add. 30

Exhibit E ........................................................................................Add. 34

Exhibit F ........................................................................................Add. 38

Exhibit G ........................................................................................Add. 52

Exhibit H ........................................................................................Add. 57

Exhibit I ........................................................................................Add. 60

Exhibit J ........................................................................................Add. 63

Exhibit K ........................................................................................Add. 68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.,*
611 F.3d 248 (5th Cir. 2010) ..................................................................................26

*Am. Hosp. Ass'n v. Bowen,*
834 F.2d 1037 (D.C. Cir. 1987) ...............................................................................32

*ANR Storage Co. v. FERC,*
904 F.3d 1020 (D.C. Cir. 2018) .........................................................................41-42

*Axson-Flynn v. Johnson,*
356 F.3d 1277 (10th Cir. 2004) ...............................................................................17

*Blackhawk v. Pennsylvania,*
381 F.3d 202 (3d Cir. 2004) ....................................................................................16

*Bowen v. Georgetown Univ. Hosp.,*
488 U.S. 204 (1988) .................................................................................................30

*Brown v. Entm't Merchs. Ass'n,*
564 U.S. 786 (2011) .................................................................................................24

*Buck v. Gordon,*
No. 1:19-cv-286, 2019 WL 4686425 (W.D. Mich. Sept. 26, 2019)................................*passim*

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ...................................................................................24, 25, 29

*Cal. State Outdoor Advert. Ass'n, Inc. v. California,*
No. S-05-0599, 2006 WL 662747 (E.D. Cal. Mar. 16, 2006)....................................28

*Chamber of Commerce v. Dep't of Labor,*
885 F.3d 360 (5th Cir. 2018) ...................................................................................41

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979) ...........................................................................................30, 31

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) .........................................................................................*passim*

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) .................................................................................................40

*Collins v. NTSB,*
  351 F.3d 1246 (D.C. Cir. 2003) ..............................................................30

*Cunningham v. City of Shreveport,*
  407 F. Supp. 3d 595 (W.D. La. 2019) ....................................................17

*DeOtte v. Azar,*
  393 F. Supp. 3d 490 (N.D. Tex. 2019) .............................................45-46

*eBay, Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) ..................................................................................4

*Elrod v. Burns,*
  427 U.S. 347 (1976) ................................................................................45

*Emp't Div. v. Smith,*
  494 U.S. 872 (1990) ..................................................................15, 16, 17

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ................................................................................34

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,*
  170 F.3d 359 (3d Cir. 1999) (Alito, J.) ............................................17, 18

*Gonzales v. O Centro Espirita Beneficente Uniao
  do Vegetal,* 546 U.S. 418 (2006)......................................................*passim*

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ................................................................................33

*Holt v. Hobbs,*
  135 S. Ct. 853 (2015) ......................................................................*passim*

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
  565 U.S. 171 (2012) ................................................................................43

*ITT Educ. Servs., Inc. v. Acre,*
  533 F.3d 342 (5th Cir. 2008) ....................................................................4

*Kikumura v. Hurley,*
  242 F.3d 950 (10th Cir. 2001)................................................................45

*Korte v. Sebelius,*
  735 F.3d 654 (7th Cir. 2013) ..................................................................45

*La. Pub. Serv. Comm'n v. FCC,*
  476 U.S. 355 (1986) ................................................................................30

*La Union del Pueblo Entero v. FEMA,*
  141 F. Supp. 3d 681 (S.D. Tex. 2015) ...................................................32

*Larson v. Valente,*
  456 U.S. 228 (1982) .............................................................................19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) .............................................................................34

*Luminant Generation Co. v. EPA,*
  675 F.3d 917 (5th Cir. 2012) ...............................................................35

*Mass. Fair Share v. Law Enforcement Assistance Admin.,*
  758 F.2d 708 (D.C. Cir. 1985) .........................................................31-32

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
  138 S. Ct. 1719 (2018) ....................................................................43, 44

*McDaniel v. Paty,*
  435 U.S. 618 (1978) .............................................................................20

*Metro. Stevedore Co. v. Rambo,*
  521 U.S. 121 (1997) .............................................................................30

*Michigan v. EPA,*
  135 S. Ct. 2699 (2015) ....................................................................42, 44

*Midrash Sephardi, Inc. v. Town of Surfside,*
  366 F.3d 1214 (11th Cir. 2004) ............................................................18

*Mitchell Cty. v. Zimmerman,*
  810 N.W.2d 1 (Iowa 2012) ...................................................................18

*Morton v. Ruiz,*
  415 U.S. 199 (1974) .........................................................................32-33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)...........................................................................40, 42

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) .............................................................................35

*Nat'l Ass'n of Home Health Agencies v. Schweiker,*
  690 F.2d 932 (D.C. Cir. 1982) .............................................................32

*NFIB v. Sebelius,*
  567 U.S. 519 (2012) .............................................................................36

*O'Reilly v. U.S. Army Corps of Eng'rs,*
   477 F.3d 225 (5th Cir. 2007) ................................................................40

*Obergefell v. Hodges,*
   135 S. Ct. 2584 (2015) ........................................................................21

*Opulent Life Church v. City of Holly Springs,*
   697 F.3d 279 (5th Cir. 2012) ........................................................ 45, 46

*Paul v. United States,*
   140 S. Ct. 342 (2019) ..........................................................................34

*RTM Media, L.L.C. v. City of Houston,*
   518 F. Supp. 2d 866 (S.D. Tex. 2007) ................................................45

*Schism v. United States,*
   316 F.3d 1259 (Fed. Cir. 2002) ..........................................................39

*SEC v. Chenery Corp.,*
   318 U.S. 80 (1943)................................................................................42

*South Dakota v. Dole,*
   483 U.S. 203 (1987) .................................................................. 35, 38-39

*Sw. Elec. Power Co. v. EPA,*
   920 F.3d 999 (5th Cir. 2019) ..............................................................41

*Tagore v. United States,*
   735 F.3d 324 (5th Cir. 2013) ..............................................................22

*Texas v. United States,*
   328 F. Supp. 3d 662 (S.D. Tex. 2018) ................................................32

*Texas v. United States,*
   787 F.3d 733 (5th Cir. 2015) ..............................................................32

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ..............................................................32

*Thomas v. Review Bd.,*
   450 U.S. 707 (1981) ............................................................................26

*Transactive Corp. v. United States,*
   91 F.3d 232 (D.C. Cir. 1996)..............................................................42

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
   137 S. Ct. 2012 (2017) ........................................................................20

*Tucker v. Collier*,
  906 F.3d 295 (5th Cir. 2018) ............................................................28

*Util. Air Reg. Grp. v. EPA*,
  573 U.S. 302 (2014) ............................................................ 36-37, 39

*Ward v. Polite*,
  667 F.3d 727 (6th Cir. 2012) ........................................................ 16, 17

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ............................................................33

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ............................................................ 20, 21

**Statutes**

5 U.S.C. § 301 ............................................................29, 30, 39

5 U.S.C. § 553 ............................................................30, 31, 32

5 U.S.C. § 706 ............................................................ 4, 29, 34, 36

42 U.S.C. § 603 ............................................................38

42 U.S.C. § 608 ............................................................ 38, 41

42 U.S.C. § 671 ............................................................*passim*

42 U.S.C. § 672 ............................................................42

42 U.S.C. § 674 ............................................................ 35, 38

42 U.S.C. § 2000bb-1 ............................................................ 24, 43

42 U.S.C. § 2000bb-3 ............................................................44

Ala. Stat. § 26-10D-5 ............................................................6

Kan. Stat. § 60-5322 ............................................................6

Mich. Comp. Laws § 722.124e ............................................................6

Miss. Code § 11-62-5 ............................................................6

N.D. Cent. Code § 50-12-07.1 ............................................................6

Okla. Stat. tit. 10A, § 1-8-112 ............................................................6

S.D. Codified Laws § 26-6-38 ................................................................................6

Tenn. 2020 HB 0836 ..............................................................................................6

Tex. Gov't Code § 2400.002 ................................................................................43

Tex. Hum. Res. Code § 45.004 ......................................................................5, 43

Tex. Hum. Res. Code § 45.005 ............................................................................5-6

Va. Code § 63.2-1709.3 ..........................................................................................6

**Regulations**

1 C.F.R. § 21.40 ...................................................................................................30

45 C.F.R. § 75.101 ........................................................................................39, 41

45 C.F.R. § 75.102 ..............................................................................10, 17, 22

45 C.F.R. § 75.300 .........................................................................................*passim*

45 C.F.R. § 1355.25 .............................................................................................43

81 Fed. Reg. 45,270 (July 13, 2016) ...............................................................*passim*

81 Fed. Reg. 89,393 (Dec. 12, 2016) ............................................................30, 43

**Other Authorities**

Children's Bureau, Title IV-E Foster Care (May 17, 2012) ...........................42

Fed. R. Civ. P. 56(a) ......................................................................................4, 30

Julia Duin, *Catholics End D.C. Foster-Care Program*, Washington Times
(Feb. 18, 2010) ................................................................................................7

Michael Stokes Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S.
Code*, 56 Mont. L. Rev. 249 (1995) ........................................................24, 44

Patricia Wen, *Catholic Charities Stuns State, Ends Adoptions*, boston.com
(Mar. 10, 2006) ...............................................................................................7

U.S. Const. amend. I ...........................................................................................43

Tex. Const. art. I .................................................................................................43

10B Wright & Miller, Federal Practice and Procedure § 2733 (4th ed.) ...........29-30

## INTRODUCTION

The federal government has enacted an illegal impediment to helping children in foster care. The foster care system needs more providers willing to serve children, but 45 C.F.R. § 75.300(c)-(d) (Section 75.300) prevents many faith-based providers, like Plaintiff Archdiocese of Galveston-Houston, from participating. Section 75.300 puts organizations like the Archdiocese to a terrible choice: either compromise their sincere religious beliefs about the family or refrain from serving children in the foster care system. At least one state—Michigan—has already used Section 75.300 to force private, faith-based foster care and adoption providers to either violate their sincere religious beliefs or refrain from providing much-needed services to children.

That is a significant problem for Plaintiffs the State of Texas and its Department of Family and Protective Services. In 2017, Texas tried to expand its diverse network of residential child care providers by enacting HB 3859, a law designed to ensure both that faith-based providers can serve children in foster care and that everyone can receive services through a willing provider. But the imposition of Section 75.300 is preventing HB 3859 from having its intended effect of expanding residential child care provider options in Texas.

Here, the Department of Health and Human Services (HHS) has already acknowledged that Section 75.300 has legal infirmities, and that its enforcement would harm the foster care system and decrease the number of providers available to serve children in need. That is why it granted South Carolina a blanket exemption from one aspect of this regulation. But it has

not granted Texas's request for a similar exemption. Add. 69-73.[1] And while HHS has announced a temporary stop to its own enforcement of Section 75.300, it has admitted this does not remove Section 75.300 from the Federal Register or make conduct that violates the regulation lawful. To the contrary, Section 75.300 remains on the books, posing a substantial risk to federal funding for states and private providers if it is violated. This uncertainty—combined with the possibility that a change in administration, a lawsuit, or other administrative action may prevent the government from following through on its claimed intention to amend Section 75.300 after rulemaking—is deterring the Archdiocese of Galveston-Houston from even considering how it might sponsor foster care services in partnership with the State of Texas. This is why Texas and the Archdiocese have filed suit challenging the regulation and seek summary judgment on a subset of their claims at the outset; to increase the number of foster care providers available to children in need.

Section 75.300 violates the First Amendment. Neither neutral nor generally applicable, the regulation cannot survive strict scrutiny. It also violates the Religious Freedom Restoration Act (RFRA) because it substantially burdens the Archdiocese's free exercise of religion without furthering a compelling government interest. Indeed, HHS itself admitted that Section 75.300 raises RFRA concerns when it granted the South Carolina exemption.

Section 75.300 also violates the Administrative Procedure Act (APA). First, no statute authorized HHS to promulgate Section 75.300. Second, Section 75.300 contradicts the statutory provisions Congress enacted to govern foster care. Third, HHS's action was arbitrary

---

[1] All citations to "Add." refer to Plaintiffs' Addendum to the Motion for Partial Summary Judgment.

and capricious because it was internally inconsistent and because it ignored both the best interests of children in foster care and the religious liberty interests of faith-based providers.

Given the facial infirmities in the challenged regulation—along with the federal government's numerous admissions in their notice of proposed rulemaking and notice of non-enforcement—there is no need for extensive development of a factual record. The record is not in dispute, and adjudication of the legal issues raised in this motion for partial summary judgment is likely to fully resolve this case. Doing so promptly will conserve judicial and party resources and, most importantly, eliminate an illegal impediment to serving children in need.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiffs filed this action pursuing declaratory, injunctive, and APA relief against application of 45 C.F.R. § 75.300 to child care providers working with the Texas foster care system, including prospective religious child care providers such as Plaintiff Archdiocese of Galveston-Houston. This motion for partial summary judgment seeks final judgment on some of Plaintiffs' claims and declaratory and injunctive relief.

## STATEMENT OF THE ISSUES

Plaintiffs seek summary judgment on their claims that application of 45 C.F.R. § 75.300 to the Archdiocese and Texas violates the Free Exercise Clause, RFRA, and the APA. In turn:

1. Does Section 75.300 violate the Free Exercise Clause as applied to the Archdiocese? (Count VII)

2. Does Section 75.300 violate the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, as applied to the Archdiocese? (Count VI)

3. Was Section 75.300 promulgated in violation of the Administrative Procedure Act, 5 U.S.C. § 706, because it was: (a) in excess of statutory authority (Count III); (b) contrary to statutory limitations in Title IV-E, 42 U.S.C. § 671 (Count II); and/or (c) arbitrary and capricious as internally inconsistent and not accounting for important interests (Counts IV-V)?

Summary judgment should be granted where the movant shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Plaintiffs also seek injunctive relief against enforcement of the regulation and its substantive requirements. To obtain permanent injunctive relief, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *ITT Educ. Servs., Inc. v. Acre*, 533 F.3d 342, 347 (5th Cir. 2008) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The Texas foster care system.

Texas's foster care system cares for children who cannot live safely at home. The Texas Department of Family and Protective Services (DFPS) administers that system, Add. 2, ¶ 2, but it does not work alone. DFPS partners with residential child care providers throughout the State. Having a diverse network of providers helps DFPS fulfill its responsibilities. *Id.* ¶ 6.

These providers include both secular and faith-based organizations. They have varying views on religion, sexual orientation, gender identity, and the definition of marriage. *Id.* ¶ 7.

DFPS spends about half a billion dollars per year on residential child care. About a quarter of that money is federal funding awarded by HHS under Title IV-E of the Social Security Act. *Id.* ¶ 8. Multiple faith-based providers that work with DFPS receive Title IV-E funding. *Id.* ¶ 11. Texas children and DFPS both benefit from the services these organizations provide. *Id.* ¶ 12.

To ensure it could continue partnering with faith-based providers, Texas enacted HB 3859. It protects faith-based residential child care providers from being forced to violate their sincere religious beliefs by state government actors. *See* Tex. Hum. Res. Code §§ 45.001–010. HB 3859 provides that the State and its affiliates "may not discriminate or take any adverse action against a child welfare services provider" for refusing to provide certain services based on religious convictions. *Id.* § 45.004. Service providers "may not be required to provide any service that conflicts with the provider's sincerely held religious beliefs." *Id.* § 45.005(a).

These religious-liberty protections increase the number of organizations able to help children in the foster care system. They do not prevent any child or family from obtaining the care that they need. HB 3859 requires service providers who decline to provide certain services to refer children and families to other providers "who provide the service being denied." *Id.* § 45.005(c). That furthers HB 3859's goal of ensuring the largest possible pool of service providers in Texas without limiting a single child's access to necessary services.

Other states have taken a similar approach. Alabama, Kansas, Michigan, Mississippi, North Dakota, Oklahoma, South Dakota, Tennessee, and Virginia have all passed analogous laws to

serve the children of their states while respecting the religious convictions of those who serve them.[2]

But Section 75.300 threatens DFPS's ability to continue working with a diverse network of residential child care providers. Some providers have sincerely held religious beliefs that prevent them from complying with the requirements of Section 75.300. If, as a condition of receiving that and other federal funding, DFPS is forced to forgo working with these types of providers, it would reduce the system's placement capacity. Such reduced capacity would harm children in foster care. Add. 4 ¶ 12.

### B. The Archdiocese would like to support the provision of foster care services to children in need.

Plaintiff Archdiocese of Galveston-Houston is headed by the Roman Catholic Archbishop of Galveston-Houston. The Archdiocese serves over 1.5 million Catholic faithful in 147 parishes and seven missions throughout ten counties in Southeast Texas. As part of its Christian mission, the Archdiocese supports charitable services both directly and through numerous ministries.

Ever since 1866—when the Sisters of Charity of the Incarnate Word began serving orphaned children in Galveston—providing loving support for society's most vulnerable children has been a priority for the Catholic Church in Southeast Texas. Add. 25-26. For over a half-century (and ending in the early 2010s), the Archdiocese provided—through its ministries—foster care services (as a child placing agency) to children and families in need

---

[2] *See* Ala. Stat. § 26-10D-5; Kan. Stat. § 60-5322; Mich. Comp. Laws § 722.124e(2)-(4); Miss. Code § 11-62-5(2)-(3); N.D. Cent. Code § 50-12-07.1; Okla. Stat. tit. 10A, § 1-8-112; S.D. Codified Laws § 26-6-38; Tenn. 2020 HB 0836; Va. Code § 63.2-1709.3.

through a license and contract with the State of Texas. While the Archdiocese discontinued this ministry, it maintained the hope of again sponsoring such services in the future. But as of late, "[m]ost Catholic Charities in the state [of Texas] ha[ve] withdrawn from serving foster children." Add. 28-29; Add. 31-33 (same). Fear of litigation targeting any program that sincerely adheres to traditional Catholic beliefs on marriage has been a significant factor driving these closures. Add. 25 (noting that these programs are "targets of litigation"); Add. 8 ¶¶ 12-13.

This problem is not unique to Texas. Across the country, Catholic foster care agencies have been forced to close their doors due to hostility from government actors and the threat, cost, and uncertainty of prolonged litigation.[3] Confronted with the difficult choice of either compromising their faith or losing their foster care ministry, these agencies chose to keep their faith.

Reinvigorating Catholic foster care is a priority for the Catholic Church in Texas. As part of this effort, the Archdiocese would like to consider how to again provide foster care support services either alone or in partnership with another organization to children and families in the Galveston-Houston area. The Texas Catholic Conference of Bishops (TCCB) has also taken steps to encourage foster care by Catholic families. TCCB supported HB 3859. *See* Add. 31 ("The Catholic Church in Texas will work to promote more foster parenting[.]"). TCCB also created the St. Joseph Ministry to help recruit more foster families. As the St. Joseph

---

[3] Patricia Wen, *Catholic Charities Stuns State, Ends Adoptions*, boston.com (Mar. 10, 2006), https://perma.cc/85ZJ-Q2U6; Julia Duin, *Catholics End D.C. Foster-Care Program*, Washington Times (Feb. 18, 2010), https://perma.cc/2GZF-JGGS.

Ministry makes clear, "[t]aking care of the orphan is a fundamental teaching of the Catholic faith." Add. 40.

For the Archdiocese, the provision of foster care services to children in need is an important religious ministry and an exercise of sincere religious beliefs. Were the Archdiocese allowed to provide foster care services to children in the Texas foster care system, this would not prevent anyone (including LGBTQ individuals) from fostering or adopting a child. The Archdiocese seeks only to *expand* the number of parents and providers available to help children find loving homes.

## C. Section 75.300 was flawed from the start.

On December 12, 2016, HHS finalized 45 C.F.R. § 75.300(c)-(d). This new regulation governed child welfare funding provided to the states under Title IV-E of the Social Security Act, 42 U.S.C. §§ 670-679b. As HHS has admitted, the current version of Section 75.300 imposed new nondiscrimination requirements beyond what was authorized by the federal statute governing the HHS program. Add. 53 ("These requirements are broader than the nondiscrimination requirements specified in the Foster Care Program Statute."); *see* 42 U.S.C. § 671(a)(18) (race, color, national origin).

Section 75.300 requires government entities awarding federal funds under Title IV-E to "communicate to the non-Federal entity all relevant public policy requirements [such as those in Section 75.300], . . . and incorporate them either directly or by reference in the terms and conditions of the Federal award." 45 C.F.R. § 75.300(a). In turn, the non-Federal entity is made "responsible for complying with all requirements of the Federal award." *Id.* § 75.300(b). According to HHS, this non-discrimination requirement applies both directly to states that

receive Title IV-E funding, and to private faith-based foster care providers. *See* Add. 55 (noting that Miracle Hill would be subject to the nondiscrimination requirement in § 75.300(c) because Section 75.300 "require[es] South Carolina to require Miracle Hill to comply with § 75.300(c) as a condition of receiving funding"); Add. 18-19 (noting that HHS is enjoined from enforcing § 75.300(c) against a "particular subgrantee[]" and explaining that "some Federal grantees have stated that they will require their subgrantees to comply with the non-statutory requirements of § 75.300(c) and (d)").

Section 75.300, however, failed to provide an accommodation for religious organizations that could not comply with the new nondiscrimination language. Add. 55 (Section 75.300 "provides no exceptions for religious organizations as are found in other statutes prohibiting religious discrimination."). Since Section 75.300 was finalized, this lack of an accommodation has caused numerous problems: This Rule has been used by state governments to justify discrimination against faith-based foster care providers, the Rule has been the subject of litigation in multiple jurisdictions, and requests for exceptions from the Rule have come in from across the country.

**D. HHS grants South Carolina a waiver of Section 75.300's religious non-discrimination provision.**

South Carolina, for example, was concerned that Section 75.300 could be used by the federal government to prohibit faith-based providers from serving children in need consistent with their sincere beliefs. The State was also concerned that this would have a detrimental impact on its foster care program. Add. 61-62. Accordingly, it petitioned HHS for an exception from Section 75.300's religious non-discrimination requirement on behalf of faith-based foster care providers like Miracle Hill—a Christian foster care provider that uses religious criteria to

select foster parents who are co-religionists. As the State explained, "faith-based organizations 'are essential' to recruiting more families for child placement," and "South Carolina would have difficulty continuing to place all children in need of foster care" without them. Add. 54.

Recognizing the important service provided by faith-based providers, HHS granted South Carolina's waiver request under 45 C.F.R. § 75.102(b), which authorizes HHS to grant case-by-case exceptions. Add. 55 ("Exceptions on a case-by-case basis for individual non-Federal entities may be authorized by the HHS awarding agency."). As HHS explained, it "found that Miracle Hill's sincere religious exercise would be substantially burdened by application of the religious nondiscrimination requirement of 75.300(c), and that subjecting Miracle Hill to that requirement . . . is not the least restrictive means of advancing a compelling government interest on the part of HHS." *Id.* As part of this analysis, HHS pointed out that "at least nine other foster care providers in Miracle Hill's area" are available to provide services that Miracle Hill cannot. *Id.*

HHS therefore concluded that "subjecting Miracle Hill to the religious nondiscrimination requirement in § 75.300(c) . . . would be inconsistent with RFRA," and would impose an "unacceptable" burden on providers like Miracle Hill. Add. 55. HHS also noted that, applied to Miracle Hill, Section 75.300 "would also cause a significant programmatic burden for the [South Carolina] Foster Care Program by impeding the placement of children into foster care." *Id.*

### E.  A federal court in Michigan enjoins Section 75.300.

State and local governments have also used Section 75.300 to threaten funding for faith-based providers. In Michigan, Section 75.300's provisions regarding sexual orientation and

gender identity were cited by Michigan Attorney General Dana Nessel to justify stripping funding and licensure from private foster and adoption agencies that could not endorse and certify same-sex marriages consistent with their sincere religious beliefs. Nessel took the position that new state-level nondiscrimination provisions were *required* by Section 75.300, explaining that "[a]s a condition of receiving these federal funds, [HHS] requires that states' Title IV-E funded programs prohibit discrimination on the basis of sexual orientation or gender identity. 45 CFR 75.300(c)." Add. 64.

Nessel's actions led a federal court in Michigan to enjoin both the state's own policy and Section 75.300 as applied to the faith-based foster care and adoption provider that filed suit. *Buck v. Gordon*, No. 1:19-cv-286, 2019 WL 4686425 (W.D. Mich. Sept. 26, 2019), appeal filed (Oct. 15, 2019). In granting this relief, the court noted that the faith-based provider "has shown that it is likely to prevail on its constitutional and RFRA claims" and rejected HHS's argument that the case was moot simply because HHS had no intention of enforcing the regulation. *Id.* at *13. As the court explained, "government officials can change their minds, re-interpret laws already on the books, and disrupt established practices." *Id.* Accordingly, the court found that HHS had failed to rebut the argument put forward by plaintiffs that faith-based agencies faced "a credible threat that [HHS] will enforce" Section 75.300. *Id.*

### F. HHS concedes that Section 75.300 likely violates RFRA and cannot survive strict scrutiny.

On October 31, 2019, the Archdiocese and the State of Texas filed this lawsuit challenging Section 75.300 under the United States Constitution, RFRA, and the APA. Shortly thereafter, HHS announced that it had "serious concerns" regarding the implementation of Section 75.300. Add. 58-59. Then, on November 19, 2019, HHS published a notice of proposed

rulemaking (NPRM) and a notice of nonenforcement in the Federal Register. Add. 18-23; Add. 35-37.

HHS explained that it was modifying Section 75.300 due to "several complaints, requests for exceptions, and lawsuits concerning § 75.300(c) and (d)." Add. 19. According to HHS, Section 75.300 had "created a lack of predictability and stability for this Department and stakeholders with respect to these provisions' viability and enforcement." *Id.* Further, the agency conceded that "certain grantees and subgrantees [] may cease providing services if forced to comply with § 75.300(c) and (d)," and that the loss of these partners "would likely reduce the effectiveness of the programs funded by federal grants by reducing the number of entities available to provide services under these programs." *Id.*

HHS also explained that it was "exercising its enforcement discretion and as such, [Section 75.300] will not be enforced, pending repromulgation." Add. 36. Yet, as the agency made clear, "merely because a regulation is not being enforced does not mean that it has been repealed or replaced. The Final Rule still appears in the Code of Federal Regulations." *Id.* Thus, HHS also explained that the NPRM "should be properly viewed as a proposal" to modify some provisions of Section 75.300 only. Add. 19. And because it is just a proposal, there is uncertainty as to what the final version of the rule might say.

### G. Section 75.300 prevents the Archdiocese from providing foster care services in partnership with Texas.

The Archdiocese believes that foster care and adoption services are an important ministry, and would like to consider how it could support foster care services to children in the state's public foster care system, but Section 75.300 currently prevents it from doing so. Until 2017, the legal environment for faith-based providers in Texas was uncertain, and numerous foster

12

care agencies had closed out of concerns over litigation and government action. But after Texas passed HB 3859 in 2017, the only legal barrier currently preventing the Archdiocese from providing foster care services is Section 75.300. And, despite HHS's recent proposed changes, this provision continues to prevent the Archdiocese from sponsoring or opening a ministry that would provide this crucial service. Creating a new foster care ministry would require a substantial investment of time, money, and relationship capital. It would require hiring and training staff, obtaining appropriate licenses and permits, obtaining office space, and recruiting families who would be interested in providing foster care. Were Section 75.300 enforced either by HHS or indirectly through litigation or other administrative action, any such investment of time, talent, and resources—necessary at both the planning and implementation phase—would be lost. Taking such a risk may not be appropriate stewardship of the Archdiocese's limited resources.

The Archdiocese is also concerned that, were it to take actions today in violation of Section 75.300, its actions could be cited as the basis for future enforcement actions by a later administration, challenged by a lawsuit enjoining any new HHS proposed rule, or disrupted by a change to the final rule different from that reflected in the NPRM. These threats continue to deter the Archdiocese from considering how to support the provision of foster care services today.

## SUMMARY OF THE ARGUMENT

Section 75.300 infringes the rights of the Archdiocese under the First Amendment. The regulation is not neutral and generally applicable in light of the exemptions it permits, and that HHS has actually permitted. Its infringements are therefore subject to strict scrutiny. But

Section 75.300 cannot survive this rigorous scrutiny because it *undermines* compelling state interests in application and is not the least restrictive means of pursuing any plausible compelling interests. Likewise, Section 75.300 conflicts with the Archdiocese's rights under RFRA—a statute protecting First Amendment freedoms that also mandates strict scrutiny— because the coercive effects on the Archdiocese's sincerely held beliefs about marriage, and practices flowing from those beliefs, are undeniable. Appropriate relief in this matter will therefore include injunctive relief against enforcement of the regulation and its substantive requirements. The infringement on First Amendment freedom is irreparable; an injunction will protect Plaintiffs from future infringement without harming Defendants' legitimate interests; and the public interest favors the protection of the constitutional rights at issue.

Further, Section 75.300 violates the Administrative Procedure Act. It is not authorized by its purported statutory authority. It unlawfully undermines Congress's choice to set a limited set of reasons for denying Title IV-E funds. And it is arbitrary and capricious as promulgated.

## ARGUMENT

### I.  Section 75.300 violates the Free Exercise Clause (Count VII).

Under current Free Exercise Clause doctrine, a law burdening religious exercise is subject to strict scrutiny if it is not "neutral" and "generally applicable." *Employment Division v. Smith*, 494 U.S. 872, 880 (1990). The Supreme Court elaborated on when a regulation fails that standard in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). There, the Court ruled 9-0 in favor of a Santería congregation that challenged four municipal ordinances restricting the killing of animals. The Court explained that the ordinances were not "generally applicable" because they were substantially "underinclusive" with regard to conduct

that undermined the government's asserted interests "in a similar or greater degree." *Id.* at 543-44; *see Smith*, 494 U.S. at 884 (contrasting laws of general applicability with those allowing for "individual exceptions"). And the *Lukumi* Court additionally found the law not "neutral" because it accomplished a "religious gerrymander"—that is, it burdened "Santeria adherents but almost no others." 508 U.S. at 535-38.

Based on *Smith* and *Lukumi*, courts have identified multiple independent reasons laws or regulations can fail to be neutral and generally applicable, which include, though are not limited to: (1) discretion to grant individualized exceptions; (2) categorical exceptions for some conduct and not others; and (3) differential treatment among religions. Each applies to HHS's enforcement and exemption practice regarding Section 75.300, and each is independently sufficient to trigger strict scrutiny.

Section 75.300 cannot withstand strict scrutiny. HHS has no compelling interest in applying Section 75.300 to religious bodies assisting foster children, including the Archdiocese. Any compelling interest HHS could assert would not actually be furthered by application to the Archdiocese or similar religious bodies. And in any event, Section 75.300 would not be the least restrictive means of pursuing any valid compelling interest asserted.

## A.  Section 75.300 is not generally applicable.

### 1.  HHS has permitted individualized exemptions to Section 75.300.

"[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Smith*, 494 U.S. at 884 (citation omitted). A government's discretion to grant case-by-case exemptions based on "the reasons for the relevant conduct" accordingly "triggers strict scrutiny." *Blackhawk v.*

*Pennsylvania*, 381 F.3d 202, 207, 210 (3d Cir. 2004) (Alito, J.) (citation omitted) (applying *Smith*); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 537 (1993) (applying *Smith* to hold that "in circumstances in which individualized exemptions from a general requirement are available," strict scrutiny applies). The rationale for the individualized exemptions doctrine is simple. When government officials are permitted to exempt conduct on a case-by-case basis, there is a risk that the law will be "applied in practice in a way that discriminates" against disfavored religious conduct, even if unintentionally so. *Blackhawk*, 381 F.3d at 209 (citing *Smith*, 494 U.S. at 884).

*Ward v. Polite* is instructive. There, a graduate-level counseling student challenged a university policy that on its face prohibited students from referring counseling clients to other students. 667 F.3d 727, 736 (6th Cir. 2012). Upon closer inspection, however, it became clear that this rule was actually an "ad hoc" policy applied at the discretion of the school. *Id.* at 739. The court thus struck down the policy, explaining that "[a]t some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy[.]" *Id.* at 740; *see also, e.g.*, *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298-99 (10th Cir. 2004) (reversing summary judgment in favor of university on Free Exercise claim challenging a university policy that allowed "ad hoc" exemptions from the university's curricular requirements).

Here, HHS understands itself to have authority "to grant exceptions on a case-by-case basis" from Section 75.300's requirements. Add. 55 (quoting 45 C.F.R. § 75.102(b)'s allowance of certain exceptions "for individual non-Federal entities"). The existence of that system of

16

individualized exemptions alone is enough to deprive Section 75.300 of general applicability. *See Smith*, 494 U.S. at 884.

### 2. HHS has permitted categorical exemptions to Section 75.300.

Similarly, government actions that categorically grant exceptions for secular but not religious conduct are subject to strict scrutiny. *Lukumi*, 508 U.S. at 534 ("The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." (citation omitted)). This is because a law is not generally applicable where it "creates a categorical exemption" for some objections but denies a comparable religious exemption. *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.) (citing *Lukumi*, 508 U.S. at 542). *See Cunningham v. City of Shreveport*, 407 F. Supp. 3d 595, 607-08 (W.D. La. 2019) (applying *Fraternal Order of Police* standard to Free Exercise claim).

In *Fraternal Order of Police*, the Third Circuit considered a free-exercise challenge to a police department's grooming policy that exempted beards grown for medical reasons, but not for religious reasons. Writing for the Third Circuit, then-Judge Alito held that the policy was not generally applicable, because the disparate treatment of the exemptions represented a "value judgment" against the relative worthiness of the religious motivation, not an even-handed application of a general law. 170 F.3d at 366. Likewise, in *Midrash Sephardi, Inc. v. Town of Surfside*, the Eleventh Circuit considered a use-limitation zoning ordinance that exempted nonprofit clubs and lodges, but not houses of worship. 366 F.3d 1214, 1234-35 (11th Cir. 2004). The Eleventh Circuit found these categorical exemptions "violate[d] the principles of neutrality and general applicability because private clubs and lodges endanger [the town's economic

17

interests] as much or more than churches and synagogues." *Id.* at 1235; *see Mitchell Cty. v. Zimmerman*, 810 N.W.2d 1, 15-16 (Iowa 2012) (vehicle regulation ordinance that provided exemptions for sources of road damage apart from steel-wheel vehicles used by Mennonites not generally applicable).

Here, the waiver given to South Carolina has the characteristics of a categorical exemption. Although it was justified with reference to case-by-case exemptions, that waiver is not limited to Miracle Hill's case. Instead, HHS categorically granted "any . . . subgrantee in the [South Carolina] Foster Care Program" that only works with parents of certain faiths an exemption from "the religious non-discrimination requirement of 45 C.F.R. § 75.300(c)." Add. 56. HHS, however, has failed to act on Texas's request for an exception from § 75.300 (c) and (d). *See* Add. 69-73. Such a categorical exemption would undermine any purported interest in non-discrimination to the same degree as an exemption for the Archdiocese and like religious bodies.[4] As a result, Section 75.300 is not generally applicable.

**B. Section 75.300 is not neutral.**

Laws fail *Smith*'s neutrality standard when they produce "differential treatment." *Lukumi*, 508 U.S. at 536. For example, the Court observed in *Lukumi* that an exemption for kosher slaughter but not Santería sacrifice created "differential treatment of two religions," which could constitute "an independent constitutional violation." *Id.* Similarly, in *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982), the Court held that the First Amendment forbade registration and reporting requirements that created differential treatment between "well-established

---

[4]    As noted below, however, neither exemption in fact undermines the relevant compelling interests at play. *See* Part I.C.

18

churches" and "churches which are new and lacking in a constituency." *Cf. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 432-37 (2006) (requiring exemption under RFRA for one religion where exemption was granted for another).

Here, the South Carolina exemption leads to differential treatment of (a) religious beliefs that limit an organization's ability to work with families that do not share its religious beliefs, and (b) religious beliefs that define a traditional understanding of marriage. Those holding the former, like Miracle Hill, are now exempt (at least in South Carolina), but those holding the latter, like the Archdiocese, are not. No examination of the intention of the exemption is necessary to establish that the result was a non-neutral policy.

### C.  Section 75.300 cannot survive strict scrutiny.

Where a law "burden[s] religious practice [and] is not neutral *or* not of general application," it is subject to "the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546 (emphasis added). This requires a showing that the law's application "advance[s] 'interests of the highest order' and [is] narrowly tailored in pursuit of those interests." *Id.* (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)). *See also Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) (applying strict scrutiny under the Free Exercise Clause); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019-20 (applying "the strictest scrutiny" to a non-neutral law, citing *Lukumi* and *McDaniel*).

Here, the Archdiocese has established that it engages in a religious practice that is burdened by Section 75.300:  Declining to "endorse or certify relationships that are inconsistent with its sincere religious beliefs, including its understanding of the nature of the human person and the characteristics of marriage and the family." Compl. ¶ 48; *see* Add. 10 ¶¶ 26, 28. Applying Section 75.300 to require the Archdiocese to provide home studies and certifications for unmarried cohabiting or same-sex married couples would plainly burden that abstention.

19

Such a burden cannot be justified under strict scrutiny for three independent reasons. First, HHS cannot identify a compelling governmental interest that would be served by applying Section 75.300 to the Archdiocese and like religious bodies. Second, applying Section 75.300 would not further any of HHS's potential interests. And third, Section 75.300 is not the least restrictive means of serving any plausible compelling interest.

### 1. HHS has no compelling governmental interest in applying Section 75.300 to the Archdiocese or other religious bodies that help foster children.

First, a governmental interest is by definition not compelling if the government does not consistently protect it. *Lukumi*, 508 U.S. at 547 (where government "leaves appreciable damage to [a] supposedly vital interest unprohibited," that interest "cannot be regarded" as compelling within the meaning of the strict scrutiny test (citation omitted)). Here, the record makes clear that the government has done anything *but* strictly enforce this regulation, making its interest far from compelling. *See* Part I.A-B. Further, the government has no interest at all in eliminating religious distinctions made by religious organizations with respect to the nature of marriage. Theology is not within the government's purview, and the Supreme Court has already defined the beliefs about marriage and the family at issue here as grounded in "decent and honorable religious or philosophical premises." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015).

Nor can the government offer an interest "of the highest order" *as applied to the plaintiffs* in this case. *Yoder*, 406 U.S. at 215. Under strict scrutiny, the burden is on "the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015) (citation omitted) (applying

strict scrutiny in RLUIPA context).[5] Here, the government has made clear—by choosing to exempt states from Section 75.300 in similar circumstances, and choosing not to enforce Section 75.300 to anyone not exempt for the near future—that it does not have a compelling interest in applying it to the Archdiocese in particular.

### 2. Section 75.300 does not further HHS's interests or help more children find foster families.

To meet strict scrutiny, there must be a causal connection between the government's asserted interests and the means the government chooses—the means at issue must further the government's asserted interests.

Section 75.300 does not further the government's alleged interests. "[B]roadly formulated interests" are insufficient to satisfy strict scrutiny; rather, courts "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *O Centro*, 546 U.S. at 431; *see Tagore v United States*, 735 F.3d 324, 330 (5th Cir. 2013) (RFRA requires claimant-specific analysis) (citing *O Centro*, 546 U.S. at 430). When applying such scrutiny here, as the district court in *Buck* explained, a generalized interest in ending "discrimination" is undermined by the government's plain compelling interest in "making available as many properly certified homes for the placement of foster and adopted children as possible." *See* 2019 WL 4686425, at *12; *see also O Centro*, 546 U.S. at 431 ("broadly formulated interests" do not satisfy the compelling interest test). HHS's subsequent NPRM adopts this position, foreclosing any claim to a compelling interest: "The Department believes that such an outcome [excluding groups with religious objections to certifying same-sex couples for foster or adoptive care] would likely

---

[5]   RLUIPA applies "the same standard as set forth in RFRA." *Holt*, 135 S. Ct. at 860 (quoting *O Centro*, 546 U. S. at 436).

*reduce* the effectiveness of programs funded by federal grants by reducing the number of entities available to provide services under these programs." Add. 19 (emphasis added). For this reason, HHS may authorize "case-by-case" exemptions to Section 75.300. *See* 45 C.F.R. § 75.102(b). Accordingly, no broadly-formulated interest in eradicating "discrimination" can be of the highest order here.

Second, common sense suggests that applying Section 75.300 to bar the Archdiocese from working with Texas would not eliminate *any* opportunities for same-sex couples to foster. If Texas and the Archdiocese prevail in this action, the result will be that Texas will have the *exact same* number of foster agencies available to certify same-sex and cohabitating unmarried couples—but it will *gain* agencies to recruit and serve a (large) subset of the foster parent population.

Third, applying Section 75.300 would *reduce*, not *increase*, the number of foster families available to adopt children. Fewer foster providers working to find "forever families" means fewer foster placements and more kids who age out of the system. That result runs directly counter to HHS's stated interest in increasing the number of foster placements.

### 3. Applying Section 75.300 to the Archdiocese or other religious bodies is not the least restrictive means of advancing HHS's purported interests.

By engaging in rulemaking to eliminate Section 75.300 (and previously granting Miracle Hill an exemption from them), HHS has essentially admitted that a means less restrictive of religious exercise "is available for the Government to achieve its goals." *Holt*, 135 S. Ct. at 864 ("least restrictive means" test requires that "the Government must use" any less restrictive means so available) (citation omitted); *see also Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (to survive the standard, burdening a claimant's rights must be "actually necessary to

the solution"). Amending Section 75.300 maximizes the number of foster and adoption agencies. That, therefore, achieves HHS's stated goal of maximizing the number of potential foster and adoption families—*both* LGBTQ families that seek out agencies consistent with their values, and those families that seek out certain religious foster agencies *precisely because* of their religious beliefs. *See Buck*, 2019 WL 4686425, at *11 (noting limits like HHS's "undermine[] the . . . goal of maximizing available placements for children"); Add. 19. Because such an avenue is "available for the Government," it must be taken. *See Holt*, 135 S. Ct. at 864.

## II. Section 75.300 violates the Religious Freedom Restoration Act (Count VI).

"Congress enacted RFRA in 1993 in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RFRA provides that a "[g]overnment shall not substantially burden a person's exercise of religion" unless that government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b).

RFRA is a "stringent test" that does "more than merely restore the balancing test used" in pre-*Smith* free exercise cases; "it provide[s] even broader protection for religious liberty than was available under those decisions." *Hobby Lobby*, 573 U.S. at 695 & n.3; *see also* Michael Stokes Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code*, 56 Mont. L. Rev. 249, 263 (1995) ("the test is an extremely rigorous one, referring to an extremely narrow range of permissible justifications for infringements on religious liberty"). This difficult test "is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being burdened." *Holt*, 135 S. Ct. at 863. Once it is established

that a government action substantially burdens a person's religious exercise, the court must "'scrutiniz[e] the asserted harm of granting [a] specific exemption[] to [a] particular religious claimant[],'" not debate abstractions—"and 'to look to the marginal interest in enforcing' the challenged government action in that particular context," not defer to "broadly formulated interests." *Id.* (quoting, *inter alia*, *Hobby Lobby*, 573 U.S. at 726-27).

Here, nothing about Section 75.300 satisfies RFRA's "stringent test."

## A. Section 75.300 imposes a substantial burden on the Archdiocese's religious exercise.

The substantial burden inquiry proceeds in two logical steps. The Court first must identify the sincere religious exercise at issue. Then, it must determine whether the government has placed substantial pressure on the plaintiff to abstain from that religious exercise. To determine the religious exercise at issue, courts look to *the claimant's* understanding of their beliefs, focusing solely on whether the claimant is sincere in his or her beliefs. *See, e.g., Hobby Lobby*, 573 U.S. at 724 (substantial burden analysis is not an opportunity to "[a]rrogat[e] the authority to provide a binding national answer to [a] religious and philosophical question" and "in effect tell the plaintiffs that their beliefs are flawed"); *Holt*, 135 S. Ct. at 857 (evidence that not "'all of the members of a religious sect'" share the claimant's belief about the practice at issue is irrelevant to substantial burden determination) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 715-16).

Here, as the declaration from Jennifer Allmon confirms, the Archdiocese adheres to the teachings of the Roman Catholic Church regarding the nature and purpose of marriage. *See* Add. 10 ¶ 26. These are the very same religious beliefs that the district court in *Buck* found substantially burdened by Section 75.300. *See Buck*, 2019 WL 4686425, at *1 ("What this case

is about is whether St. Vincent may continue to [place children in adoptive and foster care] and still profess and promote the traditional Catholic belief that marriage as ordained by God is for one man and one woman."). What is more, through its litigation in *Buck* and its proposed amendments to Section 75.300, the government has already all but admitted that faith-based foster care providers like the Archdiocese have sincere religious beliefs regarding marriage and the family that limit the charitable services they can provide. *Supra* 9-10, 12; Resp. to Pls.' Mot. For Prelim. Inj. at 26, *Buck v. Gordon*, No. 1:19-cv-286 (W.D. Mich. May 29, 2019), ECF No. 33 (acknowledging that St. Vincent's inability to endorse or certify same-sex and unmarried relationships is a "sincerely held religious belief[]"); Add. 20 (acknowledging the same).

Nor is there any doubt that Section 75.300 substantially burdens these religious beliefs. Such a burden exists when government action puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 718; *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 264 (5th Cir. 2010) ("a total ban of conduct" constitutes a substantial burden on religious exercise). Here, HHS has again all but admitted that Section 75.300 imposes a substantial burden on religious beliefs and practices regarding marriage held by the Archdiocese and other similarly-situated religious bodies. The NPRM itself acknowledges that the entire point of revisiting Section 75.300 is that these "non-statutory requirements" can "*conflict* with statutory requirements (*e.g.*, RFRA)." Add. 19-20 (emphasis added). Indeed, as written, Section 75.300 "does not . . . provide a clear pathway for compliance" when it conflicts with RFRA. *See id.* at 3. Unsurprisingly then, as the NPRM discusses, HHS issued a waiver to South Carolina precisely because Section 75.300 "substantially burden[s]" the religious beliefs of agencies (like Miracle Hill) that cannot violate

25

their faith in the provision of foster care and adoption services. For Miracle Hill and South Carolina, the issue was Section 75.300's ban on making distinctions based on religious belief; for the Archdiocese and Texas, the issue arises in the context of Section 75.300's ban on making distinctions according to sexual orientation and gender identity. Add. 55.

Moreover, the NPRM cites (at page 2) an injunction entered against HHS in *Buck v. Gordon*—a case where HHS similarly admitted "a potential issue under RFRA" exists if Section 75.300 were used to force a Catholic adoption agency to certify same-sex couples for fostering or adoption. *Buck*, ECF No. 33 at 25 n.11; *see also id.* at 16 ("St. Vincent undoubtedly engages in a course of conduct that implicates the Constitution when it declines to recommend same-sex couples as potential adoptive or foster parents on religious grounds, . . . ."). The district court agreed—and took notice that HHS did not seriously dispute that Section 75.300 imposes a substantial burden on St. Vincent's Catholic beliefs regarding marriage. *See* 2019 WL 4686425, at *14 n.14 ("*To the extent the Federal Defendants argue* that the Plaintiffs fail to state a claim, the argument fails. Plaintiffs have stated a plausible RFRA claim.") (emphasis added). The very same religious beliefs at issue in *Buck* are held by the Archdiocese here—and thus, the very same substantial burden exists.

Here, Section 75.300 presents the Archdiocese with the same choice St. Vincent faces in *Buck*: Change its beliefs about marriage or forgo its foster care ministry altogether. As the NPRM acknowledges, "merely because a regulation is not being enforced does not mean that it has been repealed or replaced." Add. 19. Section 75.300 "still appears in the Code of Federal Regulations," and thus, it is still the law. It will substantially burden the Archdiocese's religious exercise so long as it remains on the books—chilling the Archdiocese from participating in

foster or adoption care out of the reality acknowledged in *Buck*: "government officials can change their minds, re-interpret laws already on the books, and disrupt established practices." *Buck*, 2019 WL 4686425, at *13; *see also id.* ("Because the Federal Defendants have refused to refute . . . that there is a credible threat the federal regulation will be triggered against the State if St. Vincent's position prevails," injunctive relief is necessary)[6]; *see* Add. 10-11 ¶¶ 31-32, 36-37 (describing chilling effect). For all of these reasons, Section 75.300 substantially burdens the Archdiocese's sincere religious beliefs on marriage.

## B. Section 75.300 neither advances a compelling interest nor pursues one through the least restrictive means.

With the Archdiocese's substantial burden established, HHS now must satisfy RFRA's stringent test: a compelling interest achieved through the means least restrictive of the Archdiocese's religious exercise. *Hobby Lobby*, 573 U.S. at 706; *see Tucker v. Collier*, 906 F.3d 295, 301-02 (5th Cir. 2018) (where substantial burden is shown, "[a] case rises and falls on whether the [regulation] (1) advances a compelling interest (2) through the least restrictive means"). This is the same standard courts apply when strict scrutiny is required by the Constitution. *O Centro*, 546 U.S. at 419 ("Congress' express decision to legislate the compelling interest test indicates that RFRA challenges should be adjudicated in the same way as the test's constitutionally mandated applications."). Accordingly, and as explained above, Section 75.300

---

[6]   Because it is common for a regulation's final form to differ (sometimes dramatically) from the proposed regulation—and because the agency is under no obligation to even complete the rulemaking process—challenges to regulations subject to rulemaking are justiciable. *See, e.g.*, *Cal. State Outdoor Advert. Ass'n, Inc. v. California*, No. S-05-0599, 2006 WL 662747, at *4 (E.D. Cal. Mar. 16, 2006) (rejecting argument that "plaintiffs' request for injunctive relief is moot because defendants have initiated APA rulemaking procedures[.]") ("[D]efendants have not completed the APA procedure at this point. The court cannot speculate that defendants will continue through the APA process, . . . .").

cannot survive application of this most demanding form of scrutiny because it does not further a compelling interest, nor is it the least restrictive alternative available to HHS to accomplish its alleged interests. *Supra* Part I.C.

Accordingly, Section 75.300(c) and (d) cannot survive RFRA.

## III. Section 75.300 violates the Administrative Procedure Act.

Plaintiffs are also entitled to summary judgment "hold[ing] unlawful and set[ting] aside" Section 75.300. 5 U.S.C. § 706(2). As Plaintiffs alleged in Counts II-V of their complaint, Section 75.300 is "not in accordance with law," is "in excess of statutory . . . authority," and is "arbitrary[ and] capricious." *Id.* § 706(2)(A), (C).

"Summary judgment is particularly appropriate in cases in which the court is asked to review or enforce a decision of a federal administrative agency." 10B Wright & Miller, Federal Practice and Procedure § 2733 (4th ed.). Because Plaintiffs' APA claims turn on questions of law, "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

### A. The Housekeeping Statute does not authorize Section 75.300 (Count III).

In promulgating Section 75.300, HHS exceeded its statutory authority and acted contrary to law. HHS's claimed statutory authority did not allow promulgation of Section 75.300.

"[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Thus, HHS was required to identify a statute authorizing Section 75.300. *See* 1 C.F.R. § 21.40 (requiring "a complete citation of the authority under which the section is issued").

Here, HHS relied on only one statutory grant of authority: 5 U.S.C. § 301. *See* 81 Fed. Reg. 89,393, 89,395 (Dec. 12, 2016). That provision, known as the Housekeeping Statute, provides: "The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." 5 U.S.C. § 301.[7]

The Housekeeping Statute does not authorize Section 75.300 for two reasons. First, the statute permits only procedural rules, not substantive rules. Second, a minor provision like the Housekeeping Statute does not allow federal agencies to write major regulations like Section 75.300.

### 1. The Housekeeping Statute does not authorize substantive rules like Section 75.300.

"The antecedents of [the Housekeeping Statute] go back to the beginning of the Republic, when statutes were enacted to give heads of early Government departments authority to govern internal departmental affairs." *Chrysler Corp. v. Brown*, 441 U.S. 281, 309 (1979). Like the older versions of the Housekeeping Statute, the modern version is "simply a grant of authority to the agency to regulate its own affairs." *Id.* "It is indeed a 'housekeeping statute,' authorizing what the APA terms 'rules of agency organization[,] procedure[,] or practice' as opposed to 'substantive rules.'" *Id.* at 310 (quoting 5 U.S.C. § 553).

---

[7] HHS is not entitled to *Chevron* deference because the Housekeeping Statute "is not a statute that [HHS] is charged with administering." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997). "For generic statutes like the APA, FOIA, and FACA, the broadly sprawling applicability undermines any basis for deference, and courts must therefore review interpretative questions de novo." *Collins v. NTSB*, 351 F.3d 1246, 1253 (D.C. Cir. 2003).

This distinction is crucial. Because the Housekeeping Statute does not authorize substantive rules, the validity of Section 75.300 turns on whether it is substantive. Courts have experience distinguishing substantive rules from procedural ones because the APA's notice-and-comment requirements apply to the former but not the latter. *See* 5 U.S.C. § 553(b)(3)(A) (exempting "rules of agency organization, procedure, or practice"). They have developed a few different tests for identifying substantive rules. Every test shows that Section 75.300 is substantive.

The Supreme Court has "described a substantive rule . . . as one affecting individual rights and obligations." *Chrysler Corp.*, 441 U.S. at 302 (internal quotation omitted). By conditioning grant funding, HHS promulgated a rule in which "the rights of individuals are affected." *Mass. Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708, 711-12 (D.C. Cir. 1985) (holding that the rights of individuals are affected by "procedures for treatment of applications for grants under the Urban Crime Prevention Program").

Courts generally treat rules creating new conditions for eligibility for federal funding as substantive. *See Morton v. Ruiz*, 415 U.S. 199, 235-36 (1974); *Nat'l Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (D.C. Cir. 1982) (holding a rule affecting the process home health agencies used to secure Medicare reimbursement was substantive, not procedural). Such a rule "change[s] the *substantive standards* by which the [agency] evaluates applications which seek a benefit that the agency has the power to provide." *Texas v. United States*, 809 F.3d 134, 176-77 (5th Cir. 2015) (internal quotation omitted); *see also Texas v. United States*, 328 F. Supp. 3d 662, 729 (S.D. Tex. 2018); *La Union del Pueblo Entero v. FEMA*, 141 F. Supp. 3d 681, 709-10 (S.D. Tex. 2015).

Similarly, the Fifth Circuit often applies "the substantial impact test" to distinguish substantive and procedural rules. *Texas*, 809 F.3d at 176. Under that test, Section 75.300 is substantive because it requires Texas to choose between losing significant federal funding and changing its foster care policy. *See id.* (holding that DAPA was substantive because it "force[d] the state to choose between spending millions of dollars to subsidize driver's licenses and amending its statutes"); *Texas v. United States*, 787 F.3d 733, 766 (5th Cir. 2015) (same).

Moreover, Section 75.300 is substantive also because it "encodes a substantive value judgment or puts a stamp of approval or disapproval on a given type of behavior." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987); *see also Texas*, 809 F.3d at 176. Section 75.300 is based on a substantive value judgment about the best way to operate foster care programs. It also signals disapproval of operating foster care programs in different ways by prohibiting States from doing so. *See* 45 C.F.R. § 75.300(c) (establishing "a public policy requirement" regarding "non-merit factors").

Indeed, HHS itself seemed to recognize that Section 75.300 is substantive rather than procedural. That is presumably why HHS promulgated Section 75.300 through notice-and-comment rulemaking, which is required for a substantive rule but not a procedural rule. *See* 5 U.S.C. § 553(b).

Because Section 75.300 is a substantive rule, HHS could not promulgate it under its Housekeeping Statute authority. The regulation is unlawful under the APA and "ineffective" insofar as it purports to render Plaintiffs ineligible for funding. *Morton*, 415 U.S. at 236.

### 2. The Housekeeping Statute does not authorize HHS to address major questions.

Moreover, the major policy change HHS seeks to implement through Section 75.300 is not one that Congress authorized through the Housekeeping Statute. Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

In light of the significant policy debates concerning issues addressed in Section 75.300, it is particularly implausible to say the Housekeeping Statute authorized HHS to control states' policies regarding those issues. *See Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) ("The importance of the issue of physician-assisted suicide, which has been the subject of an 'earnest and profound debate' across the country, makes the oblique form of the claimed delegation all the more suspect.") (citation omitted).

Section 75.300 implicates major questions that Congress would not—and did not— delegate to HHS in the Housekeeping Statute. Under the major-questions doctrine, the Court should not "conclud[e] that Congress . . . intended such an implicit delegation." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000); *see also Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., concurring in the denial of certiorari) ("In order for an executive or independent agency to exercise regulatory authority over a major policy question of great economic and political importance, Congress must either: (i) expressly and specifically decide the major policy question itself and delegate to the agency the authority to regulate and enforce; or (ii) expressly and specifically delegate to the agency the authority both to decide the major policy question and to regulate and enforce.").

32

For these reasons, Section 75.300 is contrary to law and in excess of statutory authority. *See* 5 U.S.C. § 706(2)(A), (C).

## B.  Section 75.300 violates Title IV-E (Count II).

Section 75.300 contradicts and undermines the statutes governing Title IV-E funding. 5 U.S.C. § 706(2)(A), (C); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) ("[T]he APA's omnibus judicial-review provision . . . permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review.").

First, Section 75.300 purports to deny funding to states statutorily entitled to funding. In promulgating Section 75.300, the Secretary usurped congressional power by adding to the plan requirements Congress had made exclusive. Second, even if the Secretary otherwise had power to add funding conditions, he would not be able to do so here. When Congress has specifically addressed an issue in statute, the Secretary cannot impose a different rule by regulation.

### 1.  The Secretary cannot impose additional funding requirements.

Title IV-E of the Social Security Act, codified at 42 U.S.C. §§ 670-679c, establishes a conditional funding program:  Congress provides funding for state foster care programs that meet certain statutory conditions. *See South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (discussing "the conditional grant of federal funds").

To be eligible for funding, a state must submit a plan for approval by the Secretary. *See* 42 U.S.C. § 671(a). The Secretary evaluates whether State plans satisfy the statutory requirements. *See id.* "The Secretary *shall* approve any plan which complies with" Section 671(a). *Id.* § 671(b) (emphasis added). He does not have discretion to deny approval of any State plan that

33

complies with the statutory requirements. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007) (explaining that a statutory directive that an agency "shall approve" a state submission upon certain conditions "is mandatory" if the conditions are met and there is no contrary statute); *Luminant Generation Co. v. EPA*, 675 F.3d 917, 926 (5th Cir. 2012) (holding that "shall approve" creates a "statutory imperative leav[ing] the agency no discretion to do anything other than ensure that a state's submission meets the [statute's] requirements").

Once a State plan is approved, HHS must make payments to that State. *See* 42 U.S.C. § 674(a) ("For each quarter beginning after September 30, 1980, each State which has a plan approved under this part shall be entitled to a payment . . . ."). HHS does not have discretion to deny payments to States with approved plans.

Thus, the statutory plan requirements are paramount. Congress wants States to participate. That is why it created the program. But Congress also wants States to operate their foster care programs in certain ways. That is why it conditioned funding on compliance with the statutory plan requirements. *See NFIB v. Sebelius*, 567 U.S. 519, 577 (2012) (Opinion of Roberts, C.J.) ("Congress may use its spending power to create incentives for States to act in accordance with federal policies.").

These twin congressional desires are necessarily in some tension. If the plan requirements are too onerous, States may be disinclined to participate. But if the plan requirements are too lax, States may operate their programs using federal funds in ways Congress dislikes. Thus, they require a delicate balance—a balance that would be upset if the Secretary imposed his own requirements on States. Those non-statutory requirements would make the program less attractive to States without the offsetting benefit that statutory plan requirements provide:

furthering a congressional desire to see programs operated in a certain way. A non-statutory requirement would ensure only that States operated their programs in a way favored by the Secretary, not Congress.

As a result, it is no surprise Congress prohibited the Secretary from altering the statutory plan requirements. By limiting the Secretary's role, Congress ensured the Secretary would not materially alter the incentives for States to participate in Title IV-E. By disregarding the statutory limits on his role, the Secretary acted "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). "An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 325 (2014). Indeed, "that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate" is a "core administrative-law principle." *Id.* at 328.

### 2. The Secretary cannot alter the non-discrimination requirements Congress chose.

Even if the Secretary could impose his own funding requirements on States, he would not be able to impose Section 75.300. "Agencies exercise discretion only in the interstices created by statutory silence or ambiguity . . . ." *Util. Air Reg. Grp.*, 573 U.S. at 326. Congress did not overlook non-discrimination issues. Leaving no interstice or ambiguity, it provided multiple statutory non-discrimination rules and specified how they would be enforced. But Section 75.300 upends this scheme. It covers different types of discrimination and leads to different types of enforcement. Section 75.300 is inconsistent with Congress's decision to provide different non-discrimination rules.

Congress wanted to prohibit certain types of discrimination in Title IV-E programs, so it added non-discrimination provisions to the list of statutory plan requirements. One provision prohibits discrimination based on "race, color, or national origin":

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which— . . . (18) not later than January 1, 1997, provides that neither the State nor any other entity in the State that receives funds from the Federal Government and is involved in adoption or foster care placements may—(A) deny to any person the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the person, or of the child, involved; or (B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved.

42 U.S.C. § 671(a). Another statutory plan requirement prohibits discrimination concerning out-of-jurisdiction adoptions:

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which— . . . (23) provides that the State shall not—(A) deny or delay the placement of a child for adoption when an approved family is available outside of the jurisdiction with responsibility for handling the case of the child.

42 U.S.C. § 671(a).

Neither of these provisions, nor any other non-discrimination statute HHS enforces, prohibits discrimination on the basis of sexual orientation, gender identity, or same-sex marriage status.[8]

The scope of Title IV-E's non-discrimination provisions reflects Congress's deliberate choice. This is evident from Congress's decision to include different non-discrimination provisions in different parts of the Social Security Act. While Title IV-E focuses on race,

---

[8] HHS Office of Civil Rights, Laws and Regs. Enforced by OCR, https://www.hhs.gov/civil-rights/for-providers/laws-regulations-guidance/laws/index.html (last visited Oct. 31, 2019).

national origin, color, and out-of-jurisdiction status, Title IV-A prohibits different kinds of discrimination, including on the basis of age and disability. 42 U.S.C. § 608(d); *see also* 42 U.S.C. § 603(a)(5)(I)(iii) (prohibiting gender discrimination in some contexts).

Congress also created a detailed remedial scheme for addressing how its non-discrimination provisions should be enforced. *See* 42 U.S.C. § 674(d). States that violate statutory non-discrimination provisions may face limited losses of funding and private lawsuits. *See id.* §§ 674(d)(1), (3). In one fiscal quarter, a State could lose between 2 percent and 5 percent of its funding, depending on the number of violations in that fiscal year. *Id.* § 674(d)(1)(A)-(C). That is a significant amount of money, and it reflects Congress's determination about the appropriate incentives to give States. *Cf. Dole*, 483 U.S. at 211 (finding conditional spending legislation not coercive because "all [the State] would lose . . . is 5% of the funds otherwise obtainable under specified highway grant programs").

In passing statutory non-discrimination requirements applicable to Title IV-E funding, Congress carefully considered and adopted the protections it deemed necessary and appropriate in this context. Congress did not leave this issue open to regulatory amendment, nor create a gap for HHS to fill. *See Util. Air Reg. Grp.*, 573 U.S. at 326 (limiting agencies to "the interstices created by statutory silence or ambiguity"). HHS does not have discretion to impose additional non-discrimination requirements, like Section 75.300, through regulation under the Housekeeping Statute. *See Schism v. United States*, 316 F.3d 1259, 1280 (Fed. Cir. 2002) ("A reasonable lawyer advising the Secretary of Defense or any of the service secretaries at the time could not have claimed that § 301 created the right to make promises of lifetime

37

health care (beyond space available care) because there were other statutes controlling retiree care at the time.").

HHS itself has recognized that Section 75.300 cannot apply where statutory non-discrimination provisions govern. In explaining its decision not to extend Section 75.300 to Title IV-A funding, HHS wrote that "[t]he TANF statute, 42 U.S.C. 608(d) [Title IV-A], already identifies the nondiscrimination provisions that can be applied to TANF." 81 Fed. Reg. 45,270, 45,271 (July 13, 2016). Because Title IV-A's non-discrimination requirement and Section 75.300 differ in scope, 42 U.S.C. § 608(d), HHS concluded Section 75.300 should not apply to Title IV-A funding. *See* 81 Fed. Reg. 45,271; 45 C.F.R. § 75.101(f) ("Section 75.300(c) does not apply to the Temporary Assistance for Needy Families Program (title IV-A of the Social Security Act, 42 U.S.C. 601-619).").

HHS cannot resist the same logic here. Because Title IV-E, like Title IV-A, "already identifies the nondiscrimination provision that can be applied," 81 Fed. Reg. 45,271, Title IV-E also should be exempt from Section 75.300. The Secretary does not act in accordance with law when he purports to alter the non-discrimination requirements Congress set by statute.

### C.  Section 75.300 is Arbitrary and Capricious (Counts IV-V).

In promulgating Section 75.300, HHS acted arbitrarily and capriciously. To assess whether an agency action was arbitrary and capricious, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment":

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible

that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations and citations omitted).

Arbitrary-and-capricious review does not permit "second-guessing substantive decisions committed to the discretion of the agency," but it also "does not turn judicial review into a rubber stamp." *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 230 (5th Cir. 2007). A reviewing court "must make a searching and careful inquiry." *Id.* (internal quotation omitted); *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Here, Section 75.300 is arbitrary and capricious for two reasons. First, HHS's reasoning was internally inconsistent. Second, the agency failed to consider important aspects of the problem, including the best interests of foster children and religious liberty.

### 1. HHS's Reasoning Was Internally Inconsistent (Count IV).

"Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018). Here, the scope of Section 75.300 is "paradoxical" in a way that "signals arbitrary and capricious agency action." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1016 (5th Cir. 2019).

As discussed above, HHS declined to extend Section 75.300 to Title IV-A funding because "[t]he TANF statute, 42 U.S.C. 608(d), already identifies the nondiscrimination provisions that can be applied to TANF." 81 Fed. Reg. 45,271. Because Title IV-A's non-discrimination requirement and Section 75.300 differ in scope, 42 U.S.C. § 608(d), HHS concluded Section 75.300 should not apply to Title IV-A funding. *See* 81 Fed. Reg. 45,272; 45 C.F.R. § 75.101(f)

39

("Section 75.300(c) does not apply to the Temporary Assistance for Needy Families Program (title IV-A of the Social Security Act, 42 U.S.C. 601-619).").

That explanation for not extending Section 75.300 to Title IV-A funding applies equally to Title IV-E funding. Like Title IV-A, Title IV-E contains express non-discrimination provisions. And like the Title IV-A provisions, the Title IV-E provisions do not cover religion, sexual orientation, gender identity, or same-sex marriage status.

But HHS failed to apply the same logic to Title IV-E funding. It provided no explanation for treating Title IV-E funding differently from Title IV-A funding. *See* 81 Fed. Reg. 45,271. HHS has therefore provided no "'reasoned analysis' to justify the disparate treatment of regulated parties that seem similarly situated." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).[9]

That renders Section 75.300 arbitrary and capricious. "A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996).

### 2. HHS failed to account for important interests (Count V).

Section 75.300 is also arbitrary and capricious for a second reason: HHS failed to account for important considerations before adopting it. As the Supreme Court has explained, "agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*,

---

[9] Even if there were some way to explain or justify HHS's apparent inconsistency, it would be irrelevant because HHS did not provide any such explanation or justification in the Federal Register. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *see also State Farm*, 463 U.S. at 43.

135 S. Ct. 2699, 2706 (2015).

HHS's cursory analysis ignored the issue that should be paramount in all foster care policymaking: the best interests of foster children. HHS itself acknowledges that its foster care program is designed "to provide safe and stable out-of-home care for children."[10] At all points during the foster care process, decisions are supposed to be made based on the child's welfare. *See, e.g.*, 42 U.S.C. § 672(a)(2)(A)(ii) (requiring "the removal and foster care placement" to be "in accordance with . . . a judicial determination to the effect that continuation in the home from which [the child was] removed would be contrary to the welfare of the child"); 45 C.F.R. § 1355.25(a) ("The safety and well-being of children and of all family members is paramount.").

To pass a rule governing foster care without considering whether it will help or harm children in foster care is the height of irresponsibility. But that is what HHS did. The agency did not analyze whether Section 75.300 would decrease the quantity or quality of residential child care providers by driving away non-compliant organizations. *See* 81 Fed. Reg. 89,393; 81 Fed. Reg. 45,270. Section 75.300 is not the result of "reasoned decisionmaking." *Michigan*, 135 S. Ct. at 2706.

HHS also did not consider the religious-liberty interests of individuals and organizations who serve foster children. *See* 81 Fed. Reg. 89,393; 81 Fed. Reg. 45,270. Religious liberty is vitally important, both under the law and as a policy matter. It is protected by the federal and Texas Constitutions, U.S. Const. amend. I; Tex. Const. art. I, §§ 3a-6, as well as federal and

---

[10] Children's Bureau, Title IV-E Foster Care (May 17, 2012), https://www.acf.hhs.gov/cb/resource/title-ive-foster-care (last visited Oct. 31, 2019).

state statutes, *see, e.g.*, 42 U.S.C. § 2000bb-1(a); Tex. Gov't Code § 2400.002; Tex. Hum. Res. Code § 45.004.

Not surprisingly, courts have recognized the important interplay between religious liberty and non-discrimination rules. *See, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) ("At the same time, the religious and philosophical objections to gay marriage are protected views and in some instances protected forms of expression."); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 196 (2012) ("The interest of society in the enforcement of employment discrimination statutes is undoubtedly important. But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission.").

Religious liberty should be particularly important to HHS. It is charged with enforcing statutory protections for religious liberty.[11] *Cf. Masterpiece Cakeshop*, 138 S. Ct. at 1729 (noting that anti-religious sentiment is inappropriate for a government official charged with enforcing "a law that protects against discrimination on the basis of religion"). And RFRA applies to "all federal law, and the implementation of that law" unless an underlying statute "explicitly excludes such application." 42 U.S.C. § 2000bb-3(a)-(b); *see* Paulsen, 56 Mont. L. Rev. at 253-54 (explaining that RFRA modifies all federal statutes to require religious accommodations).

In this context, HHS's failure to even consider religious liberty as a factor means it did not engage in "reasoned decisionmaking." *Michigan*, 135 S. Ct. at 2706.

An agency cannot make rational policy choices regarding Section 75.300 without

---

[11] HHS Office of Civil Rights, Laws and Regulations Enforced by OCR, https://www.hhs.gov/civil-rights/for-providers/laws-regulations-guidance/laws/index.html (last visited Oct. 31, 2019).

considering the best interests of foster children and the religious liberty of the organizations that serve them. But HHS ignored these important interests. Having ignored the most relevant interests weighing against Section 75.300, HHS professed a belief that its approach would be "non-controversial." 81 Fed. Reg. 45,271. That reflects a lack of serious consideration by the agency. Absent such consideration, Section 75.300 is necessarily arbitrary and capricious.

Plaintiffs respectfully request summary judgment vacating Section 75.300.

## IV. Injunctive relief is appropriate.

"Success on the merits will often be the determinative factor" where parties seek an injunction deriving from "First Amendment free-exercise rights" even where "the claim is statutory" under RFRA. *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013). However, Plaintiffs have also met their burden to satisfy the other factors required for injunctive relief.

*Irreparable harm.* It is settled law that a violation of Plaintiffs' rights under the First Amendment and RFRA constitutes irreparable harm. "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). That same principle applies to the loss of RFRA rights. *See id.* (citing *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001)); *DeOtte v. Azar*, 393 F. Supp. 3d 490, 511-12 (N.D. Tex. 2019). Here, coercing the Archdiocese and similarly situated religious parties into assisting the foster care crisis in a manner that violates their faith poses irreparable injury.

*Balance of Harms.* The harms faced by Plaintiffs are severe, including loss of funding, liability for lawsuits, and coercion of religious practice. Meanwhile, where the government has

"alternative, constitutional ways of regulating . . . to achieve its goals," as it does here—to say nothing of the way the challenged regulations *undermine* its goals—the government cannot show that its interests outweigh constitutional freedoms. *See RTM Media, L.L.C. v. City of Houston*, 518 F. Supp. 2d 866, 875 (S.D. Tex. 2007).

*Public Interest.* Finally, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298 (internal quotation marks omitted). The same is true of injunctions enforcing RFRA. *See DeOtte*, 393 F. Supp. 3d at 512 (citing *Opulent Life Church*, 697 F.3d at 298).

Injunctive relief is also warranted on Plaintiffs' APA claims. Plaintiffs—and more importantly, Texas children—face irreparable harm from the exclusion of faith-based providers like the Archdiocese from Texas's foster care system. Both the balance of harms and the public interest favor injunctive relief against enforcement of the regulation and its substantive requirements for the reasons explained above. Further, Defendants themselves have shown those factors favor injunctive relief by granting the South Carolina exemption rather than insisting on across-the-board enforcement.

## CONCLUSION

The Court should declare Section 75.300 unlawful, set it aside, and permanently enjoin its enforcement against Plaintiffs.

Respectfully submitted this 30th day of January, 2020.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy Attorney General for Legal Counsel

DAVID J. HACKER
Special Counsel to the First Assistant

PATRICK K. SWEETEN
Associate Deputy Attorney General for
Special Litigation

*/s/ William T. Thompson*
WILLIAM T. THOMPSON
Special Counsel for Civil Litigation
Attorney-in-Charge
Texas Bar No. 24088531
Southern District of Texas Bar No. 3053077
Special Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548
Phone: (512) 936-2567
Fax: (512) 936-0545
Will.Thompson@oag.texas.gov

BENJAMIN S. WALTON
Texas Bar No. 24075241
Assistant Attorney General
General Litigation Division
P.O. Box 12548
Austin, Texas 78711
Phone: (512) 463-2120
Fax: (512) 320-0667
Benjamin.Walton@oag.texas.gov

*Attorneys for Plaintiffs State of Texas and Texas
Department of Family and Protective Services*

45

 /s/ Eric C. Rassbach
Eric C. Rassbach
Attorney-in-charge
Texas Bar No. 24013375
S.D. Texas Bar No. 87245
Nicholas Reaves
S.D. Texas Bar No. 3498680
THE BECKET FUND FOR
RELIGIOUS LIBERTY
1200 New Hampshire Ave. NW
Suite 700
Washington, D.C. 20036
Phone: (202) 955-0095
Fax: (202) 955-0090
erassbach@becketlaw.org

*Attorneys for Plaintiff Archdiocese of
Galveston-Houston*

## CERTIFICATE OF CONFERENCE

I hereby certify that plaintiffs conferred with Defendants regarding their request for relief via email on December 18, 2019, and Defendants opposed the filing of Plaintiffs' motion for partial summary judgment before Defendants had the opportunity to respond to Plaintiffs' Complaint. The Court then granted Plaintiffs' request to file this motion. *See* ECF No. 12.

/s/ *William T. Thompson*
WILLIAM T. THOMPSON

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2020, the foregoing document was served on all counsel of record via the Court's ECM/CF system.

/s/ *William T. Thompson*
WILLIAM T. THOMPSON